STEPHANIE S. CHRISTENSEN
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
ALEXANDER B. SCHWAB (Cal. Bar No. 283421)
Assistant United States Attorney
Deputy Chief, Major Frauds Section
DIANA L. PAULI (Cal. Bar No. 150289)
Assistant United States Attorney
International Narcotics, Money Laundering & Racketeering Section
       1100/1400 United States Courthouse
       312 North Spring Street
       Los Angeles, California 90012
       Telephone: (213) 894-1259/3899
       Facsimile: (213) 894-0141
       E-mail:    alexander.schwab@usdoj.gov
                  diana.pauli@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

FILED
CLERK, U.S. DISTRICT COURT

9/20/2022

CENTRAL DISTRICT OF CALIFORNIA
BY: _____CD_____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 2:22-cr-00424-MEMF-1 |
| Plaintiff, | PLEA AGREEMENT FOR DEFENDANT GHACHAM, INC. |
| v. | |
| GHACHAM, INC., | |
| Defendant. | |

     1.    This constitutes the plea agreement between GHACHAM, INC.

("defendant") and the United States Attorney's Office for the Central

District of California (the "USAO") in the investigation of

defendant's commission of customs fraud between 2011 and 2021 and

violations of the Kingpin Act between 2007 and 2021.  This agreement

is limited to the USAO and cannot bind any other federal, state,

local, or foreign prosecuting, enforcement, administrative, or

regulatory authority.

1          <u>DEFENDANT'S OBLIGATIONS</u>

2      2.   Defendant agrees to:

3          a.   Give up the right to indictment by a grand jury and,

4   at the earliest opportunity requested by the USAO and provided by the

5   Court, appear and plead guilty to counts one and two of a two-count

6   information in the form attached to this agreement as Exhibit A or a

7   substantially similar form, which charge defendant with conspiracy to

8   pass false and fraudulent papers through a customshouse, in violation

9   of 18 U.S.C. § 371, and conspiracy to engage in any transaction or

10  dealing in properties of a specially designated narcotics trafficker,

11  in violation of 21 U.S.C. §§ 1904(c)(2) and 1906(a)(1).[1]

12         b.   Not contest facts agreed to in this agreement.

13         c.   Abide by all agreements regarding sentencing contained

14  in this agreement.

15         d.   Appear for all court appearances and obey any other

16  ongoing court order in this matter.

17         e.   Not commit any crime; however, offenses that would be

18  excluded for sentencing purposes under United States Sentencing

19  Guidelines ("USSG" or "Sentencing Guidelines") § 4A1.2(c) are not

20  within the scope of this agreement.

21         f.   Be truthful at all times with the United States

22  Probation and Pretrial Services Office and the Court.

23

24

25

26
        [1] Exhibit A is an information charging defendant and Mohamed
27  Daoud Ghacham ("M. Ghacham").  Defendant understands that this plea
    agreement is not part of a "package deal" with M. Ghacham, and, in
28  the event that M. Ghacham does not separately waive indictment,
    defendant will be solely named in the operative information.

                                    2

g.    Pay the applicable special assessments and criminal fines at or before the time of sentencing unless defendant has demonstrated a lack of ability to pay such assessments and/or fines.

h.    Defendant agrees that any and all criminal debt ordered by the Court will be due in full and immediately.  The government is not precluded from pursuing, in excess of any payment schedule set by the Court, any and all available remedies by which to satisfy defendant's payment of the full financial obligation, including referral to the Treasury Offset Program.

i.    Complete the Financial Disclosure Statement on a form provided by the USAO and, within 30 days of defendant's entry of a guilty plea, deliver the signed and dated statement, along with all of the documents requested therein, to the USAO by either email at usacac.FinLit@usdoj.gov (preferred) or mail to the USAO Financial Litigation Section at 300 North Los Angeles Street, Suite 7516, Los Angeles, CA 90012.  Defendant agrees that defendant's ability to pay criminal debt shall be assessed based on the completed Financial Disclosure Statement and all required supporting documents, as well as other relevant information relating to ability to pay.

j.    Authorize the USAO to obtain a credit report upon returning a signed copy of this plea agreement.

k.    Consent to the USAO inspecting and copying all of defendant's financial documents and financial information held by the United States Probation and Pretrial Services Office.

l.    Agree to and not oppose, as a condition of probation, the imposition of a requirement to develop and implement an effective anti-money laundering compliance and ethics program consistent with USSG § 8B2.1 and in accordance with Exhibit B to this plea agreement.

As part of this compliance and ethics program, defendant also agrees to retain an independent, third-party compliance monitor (the "Monitor") to review and assess in a professionally independent and objective fashion defendant's compliance with the anti-money laundering laws.  The Monitor's duties, powers, and responsibilities are set forth in Exhibit B.  Defendant agrees that it will engage the Monitor within ninety (90) calendar days, as described in Exhibit B, from the date the Court imposes defendant's sentence.

m.    Allow funds or currency previously seized in connection with this matter in the amount of $161,626.27 to be applied by the Court to pay, in order of application, any restitution, special assessment, criminal fines, and costs that defendant is required to pay, and execute papers as necessary to accomplish this application.  Those seized funds consist of:

i.    $140,810.27 in U.S. currency seized from 6627 Riverside Avenue, Bell, California on February 25, 2021, (agency case number 2021-2704-000448, CATS ID 21-ICE-000978);

ii.    $1,020 in U.S. currency seized from 6602 Riverside Avenue, Bell, California on February 25, 2021, (agency case number 2021-2704-000447, CATS ID 21-ICE-000979); and

iii. $19,796 in U.S. currency seized from 7340 Alondra Boulevard, Paramount, California on February 25, 2021, (agency case number 2021-2704-000433, CATS ID 21-ICE-000972).

3.    Defendant further agrees:

a.    To forfeit all right, title, and interest in and to any and all monies, properties, and/or assets of any kind, derived from or acquired as a result of, or used to facilitate the commission of, or involved in the illegal activity to which defendant is

4

pleading guilty, specifically including, but not limited to, the following:

        i.    All merchandise introduced into the United States in violation of 18 U.S.C. § 545 (collectively, the "Forfeitable Property").[2]

     b.    To the Court's entry of an order of forfeiture at or before sentencing with respect to the Forfeitable Property and to the forfeiture of the assets.

     c.    That the Preliminary Order of Forfeiture shall become final as to the defendant upon entry.

     d.    To take whatever steps are necessary to pass to the United States clear title to the Forfeitable Property, including, without limitation, the execution of a consent decree of forfeiture and the completing of any other legal documents required for the transfer of title to the United States.

     e.    Not to contest any administrative forfeiture proceedings or civil judicial proceedings commenced against the Forfeitable Property.  If defendant submitted a claim and/or petition for remission for all or part of the Forfeitable Property on behalf of himself or any other individual or entity, defendant shall and hereby does withdraw any such claims or petitions, and further agrees to waive any right he may have to seek remission or mitigation of the forfeiture of the Forfeitable Property.  Defendant further waives any and all notice requirements of 18 U.S.C. § 983(a)(1)(A).

---

[2] Nothing in this plea agreement precludes the government from returning to defendant any previously seized apparel determined not to infringe on any intellectual property rights.

f.    Not to assist any other individual in any effort falsely to contest the forfeiture of the Forfeitable Property.

g.    Not to claim that reasonable cause to seize the Forfeitable Property was lacking.

h.    To prevent the transfer, sale, destruction, or loss of the Forfeitable Property to the extent defendant has the ability to do so.

i.    To fill out and deliver to the USAO a completed financial statement listing defendant's assets on a form provided by the USAO.

j.    That forfeiture of Forfeitable Property shall not be counted toward satisfaction of any special assessment, fine, restitution, costs, or other penalty the Court may impose.

k.    With respect to any criminal forfeiture ordered as a result of this plea agreement, defendant waives: (1) the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, announcements of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment; (2) all constitutional and statutory challenges to the forfeiture (including by direct appeal, habeas corpus or any other means); and (3) all constitutional, legal, and equitable defenses to the forfeiture of the Forfeitable Property in any proceeding on any grounds including, without limitation, that the forfeiture constitutes an excessive fine or punishment.  Defendant acknowledges that the forfeiture of the Forfeitable Property is part of the sentence that may be imposed in this case and waives any failure by the Court to advise defendant of this, pursuant to Federal Rule of

Criminal Procedure 11(b)(1)(J), at the time the Court accepts
defendant's guilty plea.

THE USAO'S OBLIGATIONS

4.   The USAO agrees to:

a.   Not contest facts agreed to in this agreement.

b.   Abide by all agreements regarding sentencing contained
in this agreement.

c.   At the time of sentencing, provided that defendant
demonstrates an acceptance of responsibility for the offenses up to
and including the time of sentencing, recommend a two-level reduction
in the applicable Sentencing Guidelines offense level, pursuant to
USSG § 3E1.1, and recommend and, if necessary, move for an additional
one-level reduction if available under that section.

COMPANY AUTHORIZATION

5.   Defendant represents that it is authorized to enter into
this agreement.  On or before the change of plea hearing pursuant to
this agreement, defendant shall provide the USAO and the Court with a
notarized legal document certifying that defendant is authorized to
enter into and comply with all of the provisions of this agreement.
Such resolution(s) shall designate a company representative who is
authorized to take the actions specified in this agreement, including
pleading guilty on behalf of the company.  Such documents shall also
state that all legal formalities for such authorizations have been
observed.

ORGANIZATIONAL CHANGES AND APPLICABILITY

6.   This agreement shall bind defendant, its successor entities
(if any), parent companies, and any other person or entity that
assumes the liabilities contained herein ("successors-in-interest").

7

Defendant, or its successors-in-interest, if applicable, shall provide the USAO and the United States Probation and Pretrial Services Office for the Central District of California with immediate notice of any name change, business reorganization, sale or purchase of assets, divestiture of assets, or similar action impacting their ability to pay the fine or comply with any forfeiture obligations or otherwise affecting this agreement. No change in name, change in corporate or individual control, business reorganization, change in ownership, merger, change of legal status, sale or purchase of assets, or similar action shall alter defendant's responsibilities under this agreement. Defendant shall not engage in any action to seek to avoid the obligations and conditions set forth in this agreement.

<u>NATURE OF THE OFFENSES</u>

7. Defendant understands that for defendant to be guilty of the crime charged in count one, that is, conspiracy to pass false and fraudulent papers through a customshouse, in violation of 18 U.S.C. § 371, the following must be true: (1) there was an agreement between two or more persons to commit the crime of passing false and fraudulent papers through a customshouse, in violation of 18 U.S.C. § 545; (2) defendant joined in the agreement knowing of its purpose and intending to help accomplish that purpose; (3) one of the members of the conspiracy, though not necessarily defendant, performed at least one overt act for the purpose of carrying out the conspiracy. In order for a person to commit the offense that is the object of the conspiracy, that is, the crime of passing false and fraudulent papers through a customshouse, in violation of 18 U.S.C. § 545, the following must be true: (1) the person knowingly passed a false or

fraudulent writing, including a CBP Form 7501 "Entry Summary," through a customhouse of the United States; (2) the person knew that the Entry Summary was false or fraudulent; (3) the person acted willfully and with the intent to defraud the United States; and (4) the Entry Summary had a natural tendency to influence, or was capable of influencing, action by the United States.

8.    Defendant understands that for defendant to be guilty of the crime charged in count two, that is, conspiracy to engage in any transaction or dealing in properties of a specially designated narcotics trafficker, in violation of 21 U.S.C. §§ 1904(c)(2) and 1906(a)(1), the following must be true: (1) there was an agreement between two or more persons that a United States person would engage in a transaction or dealing in property or interests in property of a specially designated narcotics trafficker, in violation of 21 U.S.C. § 1904(c)(1) and 31 C.F.R. Chapter 598; (2) defendant joined in the agreement knowing of its object and intending to help accomplish that object; and (3) defendant did so willfully.  In order for a person to commit the object of the conspiracy, that is, engaging in any transaction or dealing in properties of a specially designated narcotics trafficker, in violation of 21 U.S.C. § 1904(c)(1) and 31 C.F.R. Chapter 598, the following must be true: (1) the person engaged in a transaction or dealing; (2) the transaction or dealing was in property or interests in property of any significant foreign narcotics trafficker so identified in the report required pursuant to 21 U.S.C. § 1903(b) or (h)(1) or any foreign person designated by the Secretary of the Treasury as materially assisting in or providing financial or technological support for or to, or providing goods or services in support of the international narcotics trafficking

activities of a SNFT (a "specially designated narcotics trafficker"); and (3) the person was a United States citizen or national, permanent resident alien, entity organized under the laws of the United States, or was within the United States.

<u>PENALTIES AND RESTITUTION</u>

9.    Defendant understands that the statutory maximum sentence that the Court can impose for a violation of 18 U.S.C. § 371, is: a five-year term of probation; a fine of $500,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $400.

10.    Defendant understands that the statutory maximum sentence that the Court can impose for a violation of 21 U.S.C. §§ 1904(c)(2), 1906(a)(1), is: a five-year term of probation; a fine of $10,000,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $400.

11.    Defendant understands, therefore, that the total maximum sentence for all offenses to which defendant is pleading guilty is: a five-year term of probation; a fine of $10,500,000 or twice the gross gain or gross loss resulting from the offenses, whichever is greatest; and a mandatory special assessment of $800.

12.    Defendant understands that defendant will be required to pay full restitution to the victim of the offense to which defendant is pleading guilty.  Defendant agrees that, in return for the USAO's compliance with its obligations under this agreement, the Court may order restitution to persons other than the victim of the offense to which defendant is pleading guilty and in amounts greater than those alleged in the count to which defendant is pleading guilty.  In particular, defendant agrees that the Court may order restitution to

any victim of any of the following for any losses suffered by that victim as a result of any relevant conduct, as defined in USSG § 1B1.3, in connection with the offense to which defendant is pleading guilty.  The parties currently believe that the applicable amount of restitution includes unpaid duties of approximately $6,390,792 but recognize and agree that this amount could change based on facts that come to the attention of the parties prior to sentencing.

13.  Defendant understands that the convictions in this case may subject defendant to various collateral consequences, including, but not limited to, suspension or revocation of any license, permit or status granted to defendant by a government agency.  Defendant understands that unanticipated collateral consequences such as this will not serve as grounds to withdraw defendant's guilty pleas.

FACTUAL BASIS

14.  Defendant admits that defendant is, in fact, guilty of the offenses to which defendant is agreeing to plead guilty.  Defendant and the USAO agree to the statement of facts provided below and agree that this statement of facts is sufficient to support pleas of guilty to the charges described in this agreement and to establish the Sentencing Guidelines factors set forth in paragraph 16 below but is not meant to be a complete recitation of all facts relevant to the underlying criminal conduct or all facts known to either party that relate to that conduct.

Customs Fraud

Beginning no later than July 2011, and continuing to at least February 2021, defendant conspired with Mohamed Ghacham ("M. Ghacham") and others to knowingly, willfully, and with the intent to

defraud the United States make out and pass false, forged, and
fraudulent invoices and other documents and papers through a United
States customhouse.

At times relevant to the aforementioned conspiracy, defendant
was a clothing wholesaler incorporated in the State of California in
1997, headquartered in the city of Paramount, and which conducted
business under names such as "Platini," "Platini Jeans," "Platini
Jeans Cougar," and "Platini Signature."  M. Ghacham managed
defendant's international business affairs, which included importing
merchandise, maintaining accounting records, and corresponding with
customs brokers.  Additionally, United States Customs and Border
Protection ("CBP"), an agency within the Department of Homeland
Security, enforced the customs laws of the United States, including
the collection of duties, taxes, and fees owed to the United States
by those who import merchandise into the United States.  In the case
of merchandise to be imported into the United States, no more than a
week before the expected arrival of the merchandise at a U.S. port,
and no later than 10 days after arrival, the importer of record or
consignee, or customs broker filing on behalf of either party, was
required to file entry documents for the merchandise with CBP
pursuant to 19 C.F.R. § 142.12(b).  These documents required specific
information relating to the merchandise, such as an accurate
description of the merchandise, the purchase price, the terms of
sale, and all costs and services determined by law to be dutiable.
Entry documents for many entries included a CBP Form 7501 "Entry
Summary," which contained the final invoice purchase price.  CBP
relied on entry documents, including the stated value of the import,

to assess the proper duties, taxes, and fees for the imported merchandise.

M. Ghacham and others would order garments from suppliers in China on behalf of defendant for the purpose of importing those garments into the United States for sale in defendant's stores under the "Platini" brand.  Defendant and M. Ghacham would then direct others, including garment suppliers based in China, to generate both real invoices documenting the true amounts paid for imported garments and "customs invoices" falsely reflecting lesser amounts.  To reduce the customs duties CBP would assess to defendant, defendant and M. Ghacham would submit the fraudulent "customs invoices" to customs brokers and CBP and would cause false and fraudulent Entry Summaries, including false and fraudulent Forms 7501, to be submitted to CBP that understated the value of the imported garments.  Meanwhile, defendant and M. Ghacham would maintain the real invoices for their own accounting records.

In furtherance of the conspiracy, defendant and M. Ghacham committed the following acts, among others:

- On July 19, 2012, in an email communication, M. Ghacham directed an unindicted co-conspirator to list a false per-unit price of $3.94 for jeans when, in reality, the per-unit price was $7.87.

- On August 12, 2012, defendant caused an Entry Summary to be submitted to CBP that used a false per-unit price of $3.94 for imported garments.

- On June 14, 2013, in an email communication, M. Ghacham directed an unindicted co-conspirator to create a real

13

invoice and a "customs invoice" that understated the value of the merchandise defendant was to import.

- On January 29, 2016, in an email communication, M. Ghacham asked an unindicted co-conspirator to clarify the figures listed on a real invoice and a "customs invoice."

- On February 18, 2016, defendant caused an Entry Summary to be submitted to CBP that listed a false entered value of $22,167.20 when, in reality, the entered value of the imported garments was approximately $66,854.01.

- On June 16, 2018, in a WeChat communication, M. Ghacham directed an unindicted co-conspirator to understate the value of imported garments on a "customs invoice."

- On August 2, 2018, in a WeChat communication, M. Ghacham confirmed with an unindicted co-conspirator that the total value of imported garments was $71,423.85 but that the price listed on the "customs invoice" would be "30% of total price."

- On July 31, 2019, defendant caused an Entry Summary to be submitted to CBP that listed a false entered value of $28,382 when, in reality, the entered value of the imported garments was approximately $57,290.

- On September 14, 2020, defendant caused an Entry Summary to be submitted to CBP that listed a false entered value of $14,232 when, in reality, the entered value of the imported garments was approximately $61,392.10

Between approximately July 2011 and February 2021, defendant and M. Ghacham intentionally caused false and fraudulent Entry Summaries to be submitted to CBP in which they undervalued garments imported by

14

1   defendant by approximately $32,388,015, thereby avoiding the payment

2   of approximately $6,390,792 in customs duties.

3      Kingpin Act

4      At times relevant to the charges in this case, the Foreign

5   Narcotics Kingpin Designation Act, 21 U.S.C. §§ 1901-1908, 8 U.S.C

6   § 1182 (the "Kingpin Act"), imposed economic sanctions against

7   individuals identified by the President as significant foreign

8   narcotics traffickers.  The Kingpin Act and its implementing

9   regulations also imposed sanctions on foreign persons designated by

10   the Secretary of the Treasury as "specially designated narcotics

11   traffickers" for materially assisting in, or providing financial or

12   technological support for or to, or providing goods or services in

13   support of, the international narcotics trafficking activities of a

14   significant foreign narcotics trafficker.

15      On December 12, 2007, pursuant to the Kingpin Act, the U.S.

16   Department of the Treasury's Office of Foreign Assets Control

17   designated Maria Tiburcia Cazarez Perez ("Maria Cazarez"), a Mexican

18   national, as a specially designated narcotics trafficker subject to

19   economic sanctions pursuant to the Kingpin Act based on her

20   participation in a financial network used by Ismael "El Mayo" Zambada

21   Garcia and Victor Emilio Cazares Salazar, whom the President had

22   previously designated as significant foreign narcotics traffickers.

23      On September 26, 2006, as a joint business venture, defendant's

24   president and Maria Cazarez incorporated "Platini Jeans Cougar De

25   Mexico Sociedad de Responsabilidad Limitada de Capital Variable"

26   ("Platini Mexico").  On December 12, 2007, law enforcement agents

27   went to defendant's corporate address of record.  Defendant, through

28   its president, was notified that Maria Cazarez was a specially

designated narcotics trafficker and that defendant was prohibited by law from transacting further business with her.

LA Fashion Trading, Limited ("LA Fashion"), was a clothing supplier based in Guangzhou, China, over which defendant exercised considerable control. For example, various principals of defendant, including M. Ghacham, held positions at LA Fashion and LA Fashion listed, as its "Los Angeles Office," the address of defendant's headquarters in Paramount, California.

Beginning on or about December 12, 2007, and continuing to at least on or about February 2021, in Los Angeles County, within the Central District of California, and elsewhere, defendant, a U.S. person within the meaning of the Kingpin Act, knowingly and willfully conspired with Maria Cazarez and others known and unknown to engage in transactions and deal in property of Maria Cazarez, namely, Platini Mexico. In particular, defendant coordinated the sale of merchandise from LA Fashion to Platini Mexico, as well as payments by means of international wire transfers from Platini Mexico to LA Fashion's foreign HSBC account. For example, between August 26, 2016, and November 6, 2018, there were eight wire transfers totaling $403,408.91 between Platini Mexico and LA Fashion. On February 24, 2021, defendant possessed on computers at its Paramount, California, location various documents and communications concerning its dealings with Platini Mexico, both directly and through LA Fashion, including email correspondence including M. Ghacham concerning a December 19, 2017, wire transfer of $35,000 from a Platini Mexico bank account to an LA Fashion bank account; and a statement of account addressed to "Mari Cazarez" of Platini Mexico from LA Fashion. This account statement, dated February 24, 2021, showed an opening balance from

2017 of $508,395 and a total balance of $84,255 owed by Platini Mexico to LA Fashion.

SENTENCING FACTORS

15.    Defendant understands that in determining defendant's sentence the Court is required to calculate the applicable Sentencing Guidelines range and to consider that range, possible departures under the Sentencing Guidelines, and the other sentencing factors set forth in 18 U.S.C. §§ 3553(a) and 3572.  Defendant understands that the Sentencing Guidelines are advisory only, that defendant cannot have any expectation of receiving a sentence within the calculated Sentencing Guidelines range, and that after considering the Sentencing Guidelines and the other § 3553(a) and § 3572 factors, the Court will be free to exercise its discretion to impose any sentence it finds appropriate up to the maximum set by statute for the crime of conviction.

16.    Defendant and the USAO agree to the following applicable offense level under USSG § 8C2.3 of the Sentencing Guidelines:

Conspiracy to Pass False and Fraudulent Papers Through a Customshouse (Count One of the Information)

Base Offense Level        24          USSG §§ 2T3.1(a)(1), 2T4.1(J)

//

//

Conspiracy to Engage in Any Transaction or Dealing in Properties of a Specially Designated Narcotics Trafficker (Count Two of the Information)

17

Base Offense Level        14 / 26[3]   USSG § 2M5.1(a)(2) / (a)(1)

Multiple Count Adjustment

1 Unit/2 Units            --        USSG § 3D1.4(c)

Defendant and the USAO reserve the right to argue that additional specific offense characteristics, adjustments, and departures under the Sentencing Guidelines are appropriate.

17.  Defendant and the USAO agree that defendant's culpability score under USSG § 8C2.5 of the Sentencing Guidelines is no less than 7.

18.  Defendant and the USAO reserve the right to argue for a sentence outside the sentencing range established by the Sentencing Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1), (a)(2), (a)(3), (a)(6), and (a)(7).

WAIVER OF CONSTITUTIONAL RIGHTS

19.  Defendant understands that by pleading guilty, defendant gives up the following rights:

        a.    The right to persist in a plea of not guilty.

        b.    The right to a speedy and public trial by jury.

        c.    The right to be represented by counsel at trial. Defendant understands, however, that defendant retains the right to be represented by counsel at every other stage of the proceeding.

---

[3] The higher base offense level of 26 applies only "if (A) national security controls or controls relating to the proliferation of nuclear, biological, or chemical weapons or materials were evaded; or (B) the offense involved a financial transaction with a country supporting international terrorism."  USSG § 2M5.1(a)(1).

1        d.    The right to be presumed innocent and to have the

2   burden of proof placed on the government to prove defendant guilty

3   beyond a reasonable doubt.

4        e.    The right to confront and cross-examine witnesses

5   against defendant.

6        f.    The right to present evidence in opposition to the

7   charges, including the right to compel the attendance of witnesses to

8   testify.

9        g.    The right, if defendant chose not to present evidence,

10  to have that choice not be used against defendant.

11       h.    Any and all rights to pursue any affirmative defenses,

12  Fourth Amendment or Fifth Amendment claims, and other pretrial

13  motions that have been filed or could be filed.

14                   WAIVER OF RETURN OF DIGITAL DATA

15       20.   Understanding that the government has in its possession

16  digital devices and/or digital media seized from defendant, defendant

17  waives any right to the return of digital data contained on those

18  digital devices and/or digital media and agrees that if any of these

19  digital devices and/or digital media are returned to defendant, the

20  government may delete all digital data from those digital devices

21  and/or digital media before they are returned to defendant.

22                   WAIVER OF APPEAL OF CONVICTION

23       21.   Defendant understands that, with the exception of an appeal

24  based on a claim that defendant's guilty pleas were involuntary, by

25  pleading guilty defendant is waiving and giving up any right to

26  appeal defendant's convictions on the offenses to which defendant is

27  pleading guilty.  Defendant understands that this waiver includes,

28  but is not limited to, arguments that the statutes to which defendant

is pleading guilty are unconstitutional, and any and all claims that the statement of facts provided herein is insufficient to support defendant's pleas of guilty.

<u>LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE</u>

22.  Defendant gives up the right to appeal all of the following: (a) the procedures and calculations used to determine and impose any portion of the sentence; (b) the fine imposed by the Court, provided it is within the statutory maximum; (c) to the extent permitted by law, the constitutionality or legality of defendant's sentence, provided it is within the statutory maximum; (d) the amount and terms of any restitution order; and (e) the term of probation imposed by the Court, provided it is within the statutory maximum; and (f) any of the conditions of probation imposed by the Court.

23.  Defendant also gives up any right to bring a post-conviction collateral attack on the conviction or sentence, including any order of restitution, except a post-conviction collateral attack based on a claim of ineffective assistance of counsel, a claim of newly discovered evidence, or an explicitly retroactive change in the applicable Sentencing Guidelines, sentencing statutes, or statutes of conviction.  Defendant understands that this waiver includes, but is not limited to, arguments that the statutes to which defendant is pleading guilty are unconstitutional, and any and all claims that the statement of facts provided herein is insufficient to support defendant's plea of guilty.

24.  The USAO agrees that, provided (a) all portions of the sentence are at or below the statutory maximum specified above and (b) the Court imposes a fine of no less than $4,200,000, the USAO gives up its right to appeal any portion of the sentence, with the

20

exception that the USAO reserves the right to appeal the amount of restitution ordered.

### RESULT OF WITHDRAWAL OF GUILTY PLEA

25.   Defendant agrees that if, after entering guilty pleas pursuant to this agreement, defendant seeks to withdraw and succeeds in withdrawing defendant's guilty pleas on any basis other than a claim and finding that entry into this plea agreement was involuntary, then the USAO will be relieved of all of its obligations under this agreement.

### RESULT OF VACATUR, REVERSAL, OR SET-ASIDE

26.   Defendant agrees that if any count of conviction is vacated, reversed, or set aside, the USAO may: (a) ask the Court to resentence defendant on any remaining count of conviction, with both the USAO and defendant being released from any stipulations regarding sentencing contained in this agreement, (b) ask the Court to void the entire plea agreement and vacate defendant's guilty plea on any remaining count of conviction, with both the USAO and defendant being released from all their obligations under this agreement, or (c) leave defendant's remaining conviction, sentence, and plea agreement intact.  Defendant agrees that the choice among these three options rests in the exclusive discretion of the USAO.

### EFFECTIVE DATE OF AGREEMENT

27.   This agreement is effective upon signature and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney.

### BREACH OF AGREEMENT

28.   Defendant agrees that if defendant, at any time after the effective date of this agreement, knowingly violates or fails to

perform any of defendant's obligations under this agreement (a "breach"), the USAO may declare this agreement breached. All of defendant's obligations are material, a single breach of this agreement is sufficient for the USAO to declare a breach, and defendant shall not be deemed to have cured a breach without the express agreement of the USAO in writing. If the USAO declares this agreement breached, and the Court finds such a breach to have occurred, then: (a) if defendant has previously entered guilty pleas pursuant to this agreement, defendant will not be able to withdraw the guilty pleas, and (b) the USAO will be relieved of all its obligations under this agreement.

<u>COURT AND UNITED STATES PROBATION AND PRETRIAL SERVICES</u>

<u>OFFICE NOT PARTIES</u>

29. Defendant understands that the Court and the United States Probation and Pretrial Services Office are not parties to this agreement and need not accept any of the USAO's sentencing recommendations or the parties' agreements to facts or sentencing factors.

30. Defendant understands that both defendant and the USAO are free to: (a) supplement the facts by supplying relevant information to the United States Probation and Pretrial Services Office and the Court, (b) correct any and all factual misstatements relating to the Court's Sentencing Guidelines calculations and determination of sentence, and (c) argue on appeal and collateral review that the Court's Sentencing Guidelines calculations and the sentence it chooses to impose are not error, although each party agrees to maintain its view that the calculations in paragraph 16 are consistent with the facts of this case. While this paragraph permits

both the USAO and defendant to submit full and complete factual information to the United States Probation and Pretrial Services Office and the Court, even if that factual information may be viewed as inconsistent with the facts agreed to in this agreement, this paragraph does not affect defendant's and the USAO's obligations not to contest the facts agreed to in this agreement.

31.  Defendant understands that even if the Court ignores any sentencing recommendation, finds facts, or reaches conclusions different from those agreed to, and/or imposes any sentence up to the maximum established by statute, defendant cannot, for that reason, withdraw defendant's guilty pleas, and defendant will remain bound to fulfill all defendant's obligations under this agreement.  Defendant understands that no one -- not the prosecutor, defendant's attorney, or the Court -- can make a binding prediction or promise regarding the sentence defendant will receive, except that it will be within the statutory maximum.

<u>NO ADDITIONAL AGREEMENTS</u>

32.  Defendant understands that, except as set forth herein, there are no promises, understandings, or agreements between the USAO and defendant or defendant's attorney, and that no additional promise, understanding, or agreement may be entered into unless in a writing signed by all parties or on the record in court.

<u>PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING</u>

33.  The parties agree that this agreement will be considered

//

//

23

1   part of the record of defendant's guilty plea hearing as if the

2   entire agreement had been read into the record of the proceeding.

3   AGREED AND ACCEPTED

4   UNITED STATES ATTORNEY'S OFFICE
    FOR THE CENTRAL DISTRICT OF
5   CALIFORNIA

6   STEPHANIE S. CHRISTENSEN
    Acting United States Attorney
7

8                                               September 19, 2022

    ALEXANDER B. SCHWAB / DIANA L. PAULI        Date
9   Assistant United States Attorneys

10

                                                9/15/22
11  Representative of GHACHAM, INC.             Date
    Defendant
12

13                                              9/15/22

    NAREG GOURJIAN                              Date
14  Attorney for Defendant
    GHACHAM, INC.
15

16                   CERTIFICATION OF DEFENDANT

17        I have the authority to act on behalf of defendant GHACHAM,

18  INC., including entering this agreement on GHACHAM, INC.'s behalf.  I

19  have read this agreement in its entirety.  I have had enough time to

20  review and consider this agreement, and I have carefully and

21  thoroughly discussed every part of it with GHACHAM, INC.'s attorney.

22  I understand the terms of this agreement, and I voluntarily agree to

23  those terms on GHACHAM, INC.'s behalf.  I have discussed the evidence

24  against GHACHAM, INC. with GHACHAM, INC.'s attorney, and GHACHAM,

25  INC.'s attorney has advised me of GHACHAM, INC.'s rights, of possible

26  pretrial motions that might be filed, of possible defenses that might

27  be asserted either prior to or at trial, of the sentencing factors

28  set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines

                                24

1  provisions, and of the consequences of entering into this agreement.

2  No promises, inducements, or representations of any kind have been

3  made to me or GHACHAM, INC. other than those contained in this

4  agreement.  No one has threatened or forced me or GHACHAM, INC.in any

5  way to enter into this agreement.  GHACHAM, INC. and I are satisfied

6  with the representation of GHACHAM, INC.'s attorney in this matter,

7  and GHACHAM, INC., is entering guilty pleas because GHACHAM, INC. is

8  guilty of the charges and GHACHAM, INC. wishes to take advantage of

9  the promises set forth in this agreement, and not for any other

10 reason.

11 _____        9/15/22

12 Representative of GHACHAM, INC.        Date
   Defendant

13

14              CERTIFICATION OF DEFENDANT'S ATTORNEY

15     I am GHACHAM, INC.'s attorney.  I have carefully and thoroughly

16 discussed every part of this agreement with my client's authorized

17 representative Mohomed Ghacham    Further, I have fully advised

18 my client's authorized representative of my client's rights, of

19 possible pretrial motions that might be filed, of possible defenses

20 that might be asserted either prior to or at trial, of the sentencing

21 factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing

22 Guidelines provisions, and of the consequences of entering into this

23 agreement.  To my knowledge: no promises, inducements, or

24 representations of any kind have been made to my client or my

25 client's authorized representative other than those contained in this

26 agreement; no one has threatened or forced my client or my client's

27 authorized representative in any way to enter into this agreement; my

28 client's decision to enter into this agreement is informed and

voluntary; and the factual basis set forth in this agreement is
sufficient to support my client's entry of guilty pleas pursuant to
this agreement.

NAREG GOURJIAN                              Date 9/15/22
Attorney for Defendant
GHACHAM, INC.

1

2

**EXHIBIT A**

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                      FOR THE CENTRAL DISTRICT OF CALIFORNIA

10   UNITED STATES OF AMERICA,              CR No.

11           Plaintiff,                     I N F O R M A T I O N

12           v.                             [18 U.S.C. § 371: Conspiracy to
                                            Pass False and Fraudulent Papers
13   GHACHAM, INC., and                     Through Customhouse; 21 U.S.C.
     MOHAMED DAOUD GHACHAM,                 §§ 1904(c)(2), 1906(a)(1):
14    aka "Moe Ghacham,"                    Conspiracy to Engage in
                                            Transactions or Dealings in
15           Defendants.                    Properties of a Specially
                                            Designated Narcotics Trafficker;
16                                          18 U.S.C. § 981(a)(1)(C); 28
                                            U.S.C. § 2461(c): Criminal
17                                          Forfeiture]

18

19       The Acting United States Attorney charges:

20                               COUNT ONE

21                          [18 U.S.C. § 371]

22                          [All Defendants]

23   A.   INTRODUCTORY ALLEGATIONS

24       At times relevant to this Information:

25       1.   Defendant GHACHAM, INC., was a clothing wholesaler

26   incorporated in the State of California in 1997 and headquartered in

27   the city of Paramount.  Defendant GHACHAM, INC., conducted business

28

under names such as "Platini," "Platini Jeans," "Platini Jeans Cougar," and "Platini Signature."

2.    Defendant MOHAMED DAOUD GHACHAM, also known as "Moe Ghacham" ("M. GHACHAM"), was an officer of GHACHAM, INC., and managed its international business affairs, which included importing merchandise, maintaining accounting records, and corresponding with customs brokers.

3.    United States Customs and Border Protection ("CBP"), an agency within the Department of Homeland Security, was responsible for enforcing the customs laws of the United States, including the collection of duties, taxes, and fees owed to the United States by those who import merchandise into the United States.  Duties were generally set forth in a Harmonized Tariff Schedule of the United States, which was publicly disseminated pursuant to 19 U.S.C. § 1202 and 19 C.F.R. § 152.11.

4.    In the case of merchandise to be imported into the United States, no more than a week before the expected arrival of the merchandise at a U.S. port and no later than 10 days after arrival, the importer of record or consignee, or customs broker filing on behalf of either party, was required to file entry documents for the merchandise with CBP pursuant to 19 C.F.R. § 142.12(b).  These documents required specific information relating to the merchandise, such as an accurate description of the merchandise, the purchase price, the terms of sale, and all costs and services determined by law to be dutiable.  Entry documents for many entries included a CBP Form 7501 "Entry Summary," which contained the final invoice purchase price.  CBP relied on entry documents, including the stated value of

1   the import, to assess the proper duties, taxes, and fees for the

2   imported merchandise.

3   B.   OBJECT OF THE CONSPIRACY

4        5.   Beginning no later than July 2011, and continuing to at

5   least February 2021, defendant GHACHAM, INC., conspired with

6   defendant M. GHACHAM and others to knowingly, willfully, and with the

7   intent to defraud the United States make out and pass false, forged,

8   and fraudulent invoices and other documents and papers through a

9   United States customhouse, in violation of Title 18, United States

10  Code, Section 545.

11  C.   MANNER AND MEANS OF THE CONSPIRACY

12       6.   The object of the conspiracy was to be accomplished, and

13  was accomplished, in substance, as follows:

14            a.   Defendant M. GHACHAM and others would order garments

15  from suppliers in China on behalf of GHACHAM, INC., for the purpose

16  of importing those garments into the United States for sale in

17  GHACHAM, INC.'s stores under the "Platini" brand.

18            b.   Defendants GHACHAM, INC., and M. GHACHAM would direct

19  unindicted co-conspirators, including garment suppliers based in

20  China, to generate both real invoices documenting the true amounts

21  paid for the imported garments and "customs invoices" falsely

22  reflecting lesser amounts.

23            c.   To reduce the customs duties CBP would assess to

24  defendant GHACHAM, INC., defendants GHACHAM, INC. and M. GHACHAM

25  would submit the fraudulent "customs invoices" to customs brokers and

26  CBP and would cause false and fraudulent Entry Summaries, including

27  false and fraudulent Forms 7501, to be submitted to CBP that

28  understated the value of the imported garments.

        d.   Defendants GHACHAM, INC. and M. GHACHAM would maintain
the real invoices for their own accounting records.

    7.   Between approximately July 2011 and February 2021,
defendants GHACHAM, INC., and M. GHACHAM intentionally caused false
and fraudulent Entry Summaries to be submitted to CBP in which they
undervalued garments imported by defendant GHACHAM, INC. by
approximately $32,388,015, thereby avoiding the payment of
approximately $6,390,792 in customs duties.

D.   OVERT ACTS

    8.   In furtherance of the conspiracy, and to accomplish its
object, on or about the following dates, defendants GHACHAM, INC.,
and M. GHACHAM, and others known and unknown to the Grand Jury,
committed various overt acts within the Central District of
California, and elsewhere, including, but not limited to, the
following:

    Overt Act No. 1:   On July 19, 2012, in an email communication,
defendant M. GHACHAM directed an unindicted co-conspirator to list a
false per-unit price of $3.94 for jeans when, in reality, the per-
unit price was $7.87.

    Overt Act No. 2:   On August 12, 2012, defendant GHACHAM, INC.
caused an Entry Summary to be submitted to CBP that used a false per-
unit price of $3.94 for imported garments.

    Overt Act No. 3:   On June 14, 2013, in an email communication,
defendant M. GHACHAM directed an unindicted co-conspirator to create
a real invoice and a "customs invoice" that understated the value of
the merchandise defendant GHACHAM, INC., was to import.

    Overt Act No. 4:   On January 29, 2016, in an email
communication, defendant M. GHACHAM asked an unindicted co-

                                4

conspirator to clarify the figures listed on a real invoice and a "customs invoice."

Overt Act No. 5:   On February 18, 2016, defendant GHACHAM, INC., caused an Entry Summary to be submitted to CBP that listed a false entered value of $22,167.20 when, in reality, the entered value of the imported garments was approximately $66,854.01.

Overt Act No. 6:   On June 16, 2018, in a WeChat communication, defendant M. GHACHAM directed an unindicted co-conspirator to understate the value of imported garments on a "customs invoice."

Overt Act No. 7:   On August 2, 2018, in a WeChat communication, defendant M. GHACHAM confirmed with an unindicted co-conspirator that the total value of imported garments was $71,423.85 but that the price listed on the "customs invoice" would be "30% of total price."

Overt Act No. 8:   On July 31, 2019, defendant GHACHAM, INC. caused an Entry Summary to be submitted to CBP that listed a false entered value of $28,382 when, in reality, the entered value of the imported garments was approximately $57,290.

Overt Act No. 9:   On September 14, 2020, defendant GHACHAM, INC. caused an Entry Summary to be submitted to CBP that listed a false entered value of $14,232 when, in reality, the entered value of the imported garments was approximately $61,392.10.

COUNT TWO

[21 U.S.C. §§ 1904(c)(2), 1906(a)(1)]

[Defendant GHACHAM, INC.]

9.    The Acting United States Attorney incorporates paragraphs 1 through 4 and 6 through 8 of this Information here.

A.    ADDITIONAL INTRODUCTORY ALLEGATIONS

At times relevant to this Information:

10.   The Foreign Narcotics Kingpin Designation Act, 21 U.S.C. §§ 1901-1908, 8 U.S.C § 1182 (the "Kingpin Act"), imposed economic sanctions against individuals identified by the President as significant foreign narcotics traffickers.  The Kingpin Act and its implementing regulations also imposed sanctions on foreign persons designated by the Secretary of the Treasury as "specially designated narcotics traffickers" for materially assisting in, or providing financial or technological support for or to, or providing goods or services in support of, the international narcotics trafficking activities of a significant foreign narcotics trafficker.

11.   On December 12, 2007, pursuant to the Kingpin Act, the U.S. Department of the Treasury's Office of Foreign Assets Control designated Maria Tiburcia Cazarez Perez ("Maria Cazarez"), a Mexican national, as a specially designated narcotics trafficker subject to economic sanctions pursuant to the Kingpin Act based on her participation in a financial network used by Ismael "El Mayo" Zambada Garcia and Victor Emilio Cazares Salazar, whom the President had previously designated as significant foreign narcotics traffickers.

12.   Defendant GHACHAM, INC., was a United States person within the meaning of the Kingpin Act.

6

13.  On September 26, 2006, as a joint business venture, the president of defendant GHACHAM, INC., and Maria Cazarez incorporated "Platini Jeans Cougar De Mexico Sociedad de Responsabilidad Limitada de Capital Variable" ("Platini Mexico").

14.  On December 12, 2007, law enforcement agents went to defendant GHACHAM, INC.'s corporate address of record.  The president of defendant GHACHAM, INC., was notified that Maria Cazarez was a specially designated narcotics trafficker and that defendant GHACHAM, INC., was prohibited by law from transacting further business with her.

B.  <u>CONSPIRACY TO ENGAGE IN TRANSACTIONS AND DEALINGS IN PROPERTIES OF A SPECIALLY DESIGNATED NARCOTICS TRAFFICKER</u>

15.  Beginning on or about December 12, 2007, and continuing to at least on or about February 2021, in Los Angeles County, within the Central District of California, and elsewhere, defendant GHACHAM, INC., knowingly and willfully conspired with Maria Cazarez and others known and unknown to engage in transactions and deal in property of Maria Cazarez, namely, Platini Mexico, in violation of Title 21, United States Code, Section 1904(c)(1) and Title 31, Code of Federal Regulations, Part 598.

1

FORFEITURE ALLEGATION

2

[18 U.S.C. § 981(a)(1)(C); 28 U.S.C. § 2461(c)]

3      16.    Pursuant to Rule 32.2 of the Federal Rules of Criminal

4   Procedure, notice is hereby given that the United States of America

5   will seek forfeiture as part of any sentence, pursuant to Title 18,

6   United States Code, Section 981(a)(1)(C) and Title 28, United States

7   Code, Section 2461(c), in the event of either defendant's conviction

8   of the offense set forth in Count One of this Information.

9      17.    Any defendant so convicted shall forfeit to the United

10   States of America the following:

11         a.    All right, title and interest in any and all property,

12   real or personal, constituting, or derived from, any proceeds

13   obtained, directly or indirectly, as a result of the offense; and

14         b.    To the extent such property is not available for

15   forfeiture, a sum of money equal to the total value of the property

16   described in subparagraph (a).

17      18.    Pursuant to Title 21, United States Code, Section 853(p),

18   as incorporated by Title 28, United States Code, Section 2461(c), any

19   defendant so convicted shall forfeit substitute property, up to the

20   value of the property described in the preceding paragraph if, as the

21   result of any act or omission of said defendant, the property

22   described in the preceding paragraph or any portion thereof (a)

23   cannot be located upon the exercise of due diligence; (b) has been

24   transferred, sold to, or deposited with a third party; (c) has been

25   placed beyond the jurisdiction of the court; (d) has been

26   //

27   //

28

8

1  substantially diminished in value; or (e) has been commingled with

2  other property that cannot be divided without difficulty.

3

4                              STEPHANIE S. CHRISTENSEN
                               Acting United States Attorney
5

6

7                              SCOTT M. GARRINGER
                               Assistant United States Attorney
8                              Chief, Criminal Division

9                              RANEE A. KATZENSTEIN
                               Assistant United States Attorney
10                             Chief, Major Frauds Section

11                             ALEXANDER B. SCHWAB
                               Assistant United States Attorney
12                             Deputy Chief, Major Frauds Section

13                             DIANA L. PAULI
                               Assistant United States Attorney
14                             International Narcotics, Money
                                 Laundering & Racketeering Section
15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT B**

**COMPLIANCE AND ETHICS PROGRAM**

Should the Court impose the sentence agreed to in this Agreement, then in a manner consistent with all of its obligations under this Agreement, Ghacham, Inc. ("defendant") agrees to implement a compliance and ethics program, including internal controls, compliance policies, and procedures, in order to ensure that it maintains: (a) an effective system of internal accounting controls designed to ensure the making and keeping of fair and accurate, books, records, and accounts; and (b) a rigorous anti-money laundering ("AML") compliance program that incorporates relevant internal accounting controls, as well as policies and procedures designed to effectively detect and deter violations of applicable AML laws and regulations, including the Bank Secrecy Act, 31 U.S.C. § 5311 *et seq.* (collectively, "AML laws"). At a minimum, this should include, but not be limited to, the following elements to the extent they are not already part of defendant's existing, internal controls, compliance code, policies, and procedures:

*High-Level Commitment*

1.  Defendant will ensure that its owners, executives, and senior management provide strong, explicit, and visible support and commitment to its corporate policy against violations of AML laws and its compliance code.

*Policies and Procedures*

2.  Defendant will develop and promulgate a clearly articulated and visible corporate policy against violations of AML laws, which shall be memorialized in a written compliance code.

3.  Defendant will develop and promulgate written AML compliance policies and procedures designed to reduce the prospect of violations of applicable laws and defendant's

compliance code, and defendant will take appropriate measures to encourage and support the observance of its AML policies and procedures by personnel at all levels of defendant. Defendant shall notify all employees that compliance with the policies and procedures is the duty of individuals at all levels of defendant. Such policies and procedures will address, at a minimum: (1) customer identification and due diligence requirements; (2) reporting obligations for cash payments; and (3) trade transaction monitoring.

4.   Defendant will ensure that it has a system of financial and accounting procedures, including a system of internal controls, reasonably designed to ensure the maintenance of fair and accurate books, records, and accounts.

*Periodic Risk-Based Review*

5.   Defendant will develop these compliance policies and procedures on the basis of a periodic risk assessment addressing the individual circumstances of defendant, in particular the money laundering risks facing defendant, including, but not limited to, identification and due diligence of its cash-based customers, exposure to the "Black Market Peso Exchange" based on defendant's location and sector of operation, and the process by which merchandise is paid for and declared to authorities.

6.   Defendant shall review its AML compliance policies and procedures no less than annually and update them as appropriate to ensure their continued effectiveness, taking into account developments in the field and evolving international and industry standards.

*Proper Oversight and Independence*

7.   Defendant will assign responsibility to one or more senior managers or executives of defendant for the implementation and oversight of defendant's AML compliance code,

policies, and procedures. Such senior manager(s) or executive(s) shall have direct reporting lines to defendant's owners and shall have an adequate level of autonomy from management as well as sufficient resources and authority to maintain such autonomy.

*Training and Guidance*

8. Defendant will implement mechanisms designed to ensure that its AML compliance code, policies, and procedures are effectively communicated to all officers, executives, employees and, where necessary, agents (such as customs brokers) and business partners. These mechanisms shall include: (a) periodic training for all officers, executives, employees involved in audit, sales, legal, compliance, accounting, finance, or other positions that otherwise pose AML-related risks to defendant and, where necessary and appropriate, agents and business partners; (b) corresponding certifications by all such individuals certifying compliance with the training requirements.

9. Defendant will establish an effective system for providing guidance and advice to individual on complying with defendant's AML compliance program.

*Internal Reporting and Investigation*

10. Defendant will establish and maintain an effective system for internal reporting concerning potential violations of AML laws or defendant's ethics and compliance code, policies, and procedures.

11. Defendant will establish and maintain an effective and reliable process with sufficient resources for responding to, investigating, and documenting allegations of violations of AML laws or defendant's ethics and compliance code, policies, and procedures.

*Enforcement and Discipline*

12. Defendant will implement mechanisms designed to effectively enforce its compliance code, policies, and procedures, including appropriately incentivizing compliance and disciplining violations.

13. Defendant will institute appropriate disciplinary procedures to address, among other things, violations of AML laws and defendant's ethics and compliance code, policies, and procedures by defendant's executives, officers, and employees. Such procedures should be applied consistently and fairly, regardless of the position held by, or perceived importance of, the officer or employee.

14. Defendant shall implement procedures to ensure that where misconduct is discovered, reasonable steps are taken to remedy the harm resulting from such misconduct, and to ensure that appropriate steps are taken to prevent further similar misconduct, including assessing the internal controls, compliance code, policies, and procedures and making modifications necessary to ensure the overall AML compliance program is effective.

*Independent Compliance Monitor*

15. Within ninety (90) calendar days from the date of sentencing by the Court, defendant agrees to engage an independent corporate monitor (the "Monitor") for a period not to exceed three years, unless an extension is ordered by the Court.

16. The Monitor's primary responsibility is to assess and monitor defendant's compliance with the terms of the sentence so as to specifically address and reduce the risk of any recurrence of defendant's misconduct, including evaluating defendant's corporate compliance program with respect to AML laws and making recommendations for improvement.

17. Within forty-five (45) calendar days after the sentencing, and after consultation with the United States Attorney's Office for the Central District of California (the "USAO"), defendant will propose to the USAO three candidates to serve as the Monitor, who meet the criteria listed below. Defendant shall provide enough information, including certifications from the Monitor candidates, to allow the USAO to determine whether the candidates meet the following criteria:

    a.  At a minimum, the qualifications and experience sufficient in the opinion of the USAO to properly discharge the Monitor's duties;

    b.  The ability to access and deploy appropriate defendant's internal corporate resources as necessary to discharge the Monitor's duties as described herein;

    c.  Sufficient independence from defendant to ensure effective and impartial performance of the Monitor's duties as described in the agreement;

    d.  No prior relationship with defendant; and

    e.  No adversarial relationship with the USAO in any matter.

18. Within fourteen (14) calendar days of receiving the proposal for the three candidates to serve as the Monitor, the USAO will evaluate the candidates. The USAO will, in its sole discretion, determine whether the Monitor candidates have met the criteria in the prior paragraph to serve as defendant's Monitor and are otherwise acceptable to the USAO.

19. Within twenty-one (21) calendar days of defendant providing the USAO with the proposal for the three candidates to serve as the Monitor, the USAO and defendant will submit a status report to the Court. In that status report, defendant and the USAO will provide defendant with the name of any candidate for Monitor that is qualified and acceptable to the USAO, his/her qualifications, and his/her certifications. Should the

USAO determine, in its sole discretion, that at least one Monitor candidate is qualified and acceptable, the parties shall, at the same time as the status report, submit an application and proposed order for the Court to appoint one of the candidates for Monitor the USAO deems qualified and acceptable. Should the USAO determine, in its sole discretion, that no candidate for Monitor is qualified and acceptable, the parties shall so inform the Court.

20. The Monitor's term shall be three years from the date the Court appoints the Monitor. The Monitor's duties and authority, and the obligations of defendant with respect to the Monitor, the USAO, and the Court, are set forth below.

21. The parties agree that the Monitor is an independent third-party, not an employee or agent of defendant or the USAO, and that no attorney-client relationship shall be formed between defendant and the Monitor.

22. The Monitor will review and evaluate the effectiveness of defendant's internal controls, record-keeping practices, policies, and procedures as they relate to defendant's compliance with AML laws ("AML Policies and Procedures"). This review and evaluation shall include an assessment of the AML Policies and Procedures as actually implemented.

23. The retention agreement between defendant and the Monitor will reference this Agreement and include it as an attachment so the Monitor is fully apprised or his or her duties and responsibilities.

24. Defendant and its affiliates shall cooperate fully with the Monitor and the Monitor shall have the authority to take such reasonable steps as, in his or her view, may be necessary to be fully informed about the compliance program of defendant within the scope of his

or her responsibilities under this Agreement. To that end, defendant and its affiliates shall provide the Monitor with access to all information, documents, records, facilities and/or employees that fall within the scope of responsibilities of the Monitor under this Agreement, subject to the following limitations:

    a.  In the event that defendant seeks to withhold from the Monitor access to information, documents, records, facilities, and/or employees of defendant or any affiliated company that may be subject to a valid claim of attorney-client privilege, or attorney-work-product doctrine, defendant shall work cooperatively with the Monitor to resolve the matter to the satisfaction of the Monitor.

    b.  If the matter cannot be resolved, at the request of the Monitor, defendant shall promptly provide written notice to the Monitor and to the USAO. Such notice shall include a non-privileged description of the nature of the information, documents, records, facilities and/or employees withheld, as well as the basis for the claim. The USAO may then consider whether to make a further request for access to such information, documents, records, facilities and/or employees.

25. During the three-year term, the Monitor shall conduct an initial review and prepare an initial report, followed by two follow-up reviews and reports as described below:

    a.  With respect to each of the three reviews, after initial consultations with defendant and the USAO, the Monitor shall prepare a written work plan for each review, which shall be submitted in advance to defendant and the USAO for comment.

    b.  In order to conduct an effective initial review of defendant's AML Policies and Procedures, the Monitor's initial work plan shall include such steps as are

reasonably necessary to develop an understanding of the facts and circumstances surrounding any violations that may have occurred, but the parties do not intend that the Monitor will conduct his or her own investigation into those historical events.

c. Any dispute between defendant and the Monitor with respect to the work plan shall be reported to the USAO, which will recommend a solution to the dispute. Should defendant or the Monitor not agree to the USAO's recommended solution, the parties shall raise the dispute with the United States Probation & Pretrial Services Office ("USPO"). If the USPO determines, in its sole discretion, that it can decide the dispute without the intervention of the Court, it shall do so and defendant and the Monitor shall be bound by such a decision. If, instead, the USPO determines, in its sole discretion, that defendant and Monitor should seek a ruling from the Court, defendant and Monitor shall file a joint report with the Court. If requested by the Monitor, the USAO shall assist the Monitor in the drafting and filing of the joint report.

26. In connection with the initial review, the Monitor shall issue a written report within one hundred twenty (120) calendar days of the appointment of the Monitor by the Court setting forth the Monitor's assessment and, if appropriate and necessary, making recommendations reasonably designed to improve defendant's AML Policies and Procedures. The Monitor shall provide the report to defendant and contemporaneously transmit copies to the USAO, the USPO, and the Court.

    a.   Within one hundred twenty (120) calendar days after receiving the Monitor's report, defendant shall consider, in good faith, adopting the recommendations set forth in the report.

    b.   Within sixty (60) calendar days after receiving the report, defendant shall advise the Monitor, the USAO, the USPO, and the Court, in writing of any recommendations that defendant does not adopt. Defendant shall explain why it did not adopt any recommendations, including whether it considers a particular recommendation unduly burdensome, impractical, costly or otherwise inadvisable. As to any recommendation on which defendant and the Monitor ultimately do not agree, the views of defendant and the Monitor shall promptly be brought to the attention of the USAO and the USPO. The USAO and USPO may consider the Monitor's recommendation and defendant's reasons for not adopting the recommendation in determining whether to bring relevant facts to the attention of other parts of the U.S. government and the Court.

27. The Monitor shall undertake two follow-up reviews to further monitor and assess whether defendant's AML Policies and Procedures are reasonably designed to detect and prevent violations of applicable AML laws.

28. Within sixty (60) calendar days of initiating each follow-up review, the Monitor shall:

    a.   Complete the review;

    b.   Certify whether defendant's AML Policies and Procedures are appropriately designed and implemented to ensure compliance with the applicable AML laws; and

    c.  Report on the Monitor's findings in the same fashion as with respect to the initial review.

29. The first follow-up review and report shall be completed by one year after the initial review. The second follow-up review and report shall be completed by one year after the completion of the first follow-up review. The Monitor may extend the time period for submission of the follow-up reports with prior written approval of the Court.

30. In undertaking the assessments and reviews described above, the Monitor shall formulate conclusions based on:

    a.  Inspection of relevant documents, including the policies and procedures relating to defendant's AML Policies and Procedures;

    b.  On-site observation and testing of defendant's systems and procedures, including its internal controls, record-keeping, and internal audit procedures;

    c.  Meetings with, and interviews of, relevant employees, directors and other persons at mutually convenient times and places; and

    d.  Analyses, studies and testing of defendant's AML Policies and Procedures, as well as related record-keeping practices and internal controls.

31. Should the Monitor, during the course of his or her engagement, discover credible evidence that potentially unlawful transactions were not reported pursuant to applicable AML laws, the Monitor shall promptly report such conduct to defendant's executives for further investigation, unless the Monitor believes, in the exercise of his or her discretion, that such disclosure should be made directly to the USAO and the USPO.

32. If the Monitor refers the matter only to defendant's executives, the executive shall promptly report the same to the USAO and the USPO and contemporaneously notify the

Monitor that such report has been made. If defendant fails to make disclosure to the USAO and the USPO within fourteen (14) business days of the Monitor's report of such conduct to defendant, the Monitor shall independently disclose his or her findings to the USAO and the USPO.

33. Further, in the event that defendant, or any affiliate or person working directly or indirectly for defendant, refuses to provide information necessary for the performance of the Monitor's responsibilities, the Monitor shall promptly disclose that fact to the USAO and the USPO. Defendant shall not take any action to retaliate against the Monitor for any such disclosures or for any other reason.

34. At least annually, and more frequently if appropriate, representatives of defendant and the USAO will meet together to discuss the monitorship and any suggestions, comments or proposals for improvement defendant may wish to discuss with the USAO. Thereafter, and on an annual basis, defendant, the USAO and the Monitor, either jointly or separately, shall provide defendant with a status report of defendant's performance with respect to its obligations under the Plea Agreement, incorporation of the Monitor's recommendations, and its compliance with AML and other laws.